**Kathleen S. MANCUSO,**
**Plaintiff–Appellant,**

v.

**DANFOSS, INCORPORATED.,**
**Defendant–Appellee.**

**No. 00–2626.**

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 13, 2000.

Decided April 12, 2001.

Before Hon. COFFEY, Hon. EASTERBROOK, and Hon. MANION, Circuit Judges.

## ORDER

After Kathleen Mancuso sued her former employer, Danfoss, Inc., under the Americans with Disabilities Act, 42 U.S.C. § 12101–12213, the parties began a series of unrecorded settlement discussions aided by a magistrate judge. After three conferences the parties reached an apparent oral agreement, and the magistrate judge entered an order summarizing the agreement and dismissed the case. When Mancuso objected to the agreement's enforcement, the magistrate judge held a hearing at which Mancuso, her attorney, and Danfoss's attorney all testified. Mancuso's attorney, Joyce O'Neill Austin, was permitted to withdraw prior to the hearing, and Mancuso proceeded pro se. After the hearing, the magistrate judge recommended that the agreement be enforced,

and the district judge agreed. Mancuso appeals, but because she fails to show that the district court abused its discretion in enforcing the agreement, *see Carr v. Runyan*, 89 F.3d 327, 331 (7th Cir.1996), we affirm.

The following summary is derived from the hearing testimony of Mancuso, Austin, and Danfoss's counsel Roberta Holzwarth. Before the first settlement conference on October 29, 1999, Austin informed Mancuso that any settlement would dispose of all her claims against Danfoss. After the second conference on November 4, Austin informed Mancuso that Danfoss was willing to pay $1,178.50 in medical bills and that she considered Mancuso's current settlement demand to be $90,000. Although Mancuso testified that she never agreed to settle for less than $140,000 and that she gave Austin "express authority" to settle only for that amount, she does not claim to have corrected Austin's impression. Later that evening, Austin "reviewed the figures" with Mancuso and tried to convince her to settle for $45,000. Austin also told Mancuso that she would be forced to withdraw, due in part to her workload, if Mancuso refused to settle.

At the third and final settlement conference at 11:00 a.m. on November 5, the magistrate judge met in chambers first with Mancuso and Austin, and then with Holzwarth and Danfoss's president, Ross Waite. When Holzwarth emerged from chambers, she announced, "[W]e have a deal." Mancuso testified that she was surprised by this comment because she did not know "what had really transpired as far as a deal." All the parties then met with the magistrate judge in chambers, and Holzwarth reviewed the terms of the agreement. Mancuso acknowledges that at this point she had agreed to Danfoss's payment of 18 months of COBRA premiums and $1,178 in medical bills and the

provision of a neutral reference letter, but she testified that she still "had questions concerning the attorney's fees and the amount of money that was settled." Holzwarth testified, relying on her notes from the settlement conference, that the agreement contained the terms Mancuso acknowledged as well as a payment of $14,000 in attorneys' fees to Austin and a lump sum payment of $25,000 to Mancuso. Mancuso testified, however, that stress due to a friend's funeral scheduled for that afternoon and Austin's expressed intent to withdraw if a settlement was not reached impaired her ability to assent to the agreement:

> [W]hatever settlement was reached between the two attorneys I did not agree to. I ... was not in the right mind at that point in time to make a decision.

At the conclusion of the hearing, the magistrate judge found that the parties had indeed reached an oral settlement agreement:

> [T]he agreement was reached and assented to by all of the parties in front of this court.... While there were some issues that the parties were to work out in regard to the settlement agreement, the nucleus of the settlement agreement is intact.

The magistrate judge recommended that the settlement agreement be enforced to require Danfoss to submit checks to Mancuso in the amounts of $1,178 (medical bills), 18 months of COBRA premiums (estimated at $174.85 but subject to increase), and $25,000 (lump sum payment). In addition, Danfoss would submit $14,000 to Austin for attorneys' fees, issue Mancuso a COBRA notice allowing her to elect to continue her health and dental coverage for 18 months from the entry of judgment, provide Mancuso with a "neutral" reference letter, and ensure that Waite handled all employment inquiries regarding Man-

cuso. All parties were to return confidential materials to the parties that provided them, and all claims that Mancuso raised or could have raised in her complaint against Danfoss were barred. The district court adopted the magistrate judge's recommendation over Mancuso's objections.

Where a plaintiff contends that she did not knowingly and voluntarily assent to a release of federal statutory claims, we apply a "totality of the circumstances" test under federal law in addition to general principles of state contract law to determine whether the release is valid. *See Pierce v. Atchison, Topeka & Santa Fe Ry. Co.*, 65 F.3d 562, 570–72 (7th Cir.1995) (citing *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974)). Illinois law provides that oral agreements to settle will be enforced where the parties mutually assent to reasonably certain terms, *see Vandevier v. Mulay Plastics, Inc.*, 135 Ill.App.3d 787, 90 Ill.Dec. 558, 482 N.E.2d 377, 380 (Ill. App.Ct.1985), while the federal totality approach considers surrounding factors, such as the plaintiff's education and business background, her input in negotiating the terms of the settlement, the clarity of the terms, the amount of time the plaintiff deliberated before agreeing to the settlement, whether the plaintiff was counseled, and whether the consideration given in exchange for the waiver exceeded the benefits to which she already was entitled by contract or law, *see Pierce*, 65 F.3d at 571.

Mancuso first argues that no agreement existed because the terms of the purported agreement were not reasonably certain. *See, e.g., Academy Chicago Publishers*, 161 Ill.Dec. 335, 578 N.E.2d at 983. In support, she contends that the amounts of the COBRA premiums she was to receive under the agreement changed at the January 20 hearing. But the difference was less than $400, and, based on

Holzwarth's testimony at the hearing, appears to have been based on a mathematical error rather than the parties' failure to agree on the terms:

> MS. HOLZWARTH: I simply wanted to note for the court that as a result of testimony that came up yesterday regarding the figure in the proposed settlement ... not matching 18 times the COBRA premium, I went back and checked my notes from the settlement conferences, and I can't quite figure out how that occurred. I have both of those two numbers in my notes, both the 174.85 as the monthly cost and the 2732, I believe, as the 18 months.
>
> I spoke with Ross Waite of Danfoss this morning about the issue. He and I agreed that the settlement agreement was based on the idea or the belief that we would advance enough money to cover the COBRA premiums for 18 months. And so, the representation I'd be making to the court, it ought to be 18 times the $174.85.
>
> THE COURT: Which according to my multiplication is more in the neighborhood of $3100.

Moreover, as Danfoss notes, Illinois courts will enforce a contract in which some terms are missing or yet to be agreed upon so long as the terms are certain enough to provide a basis for determining whether the agreement has been kept. *See Champaign Nat'l Bank v. Landers Seed Co., Inc.*, 165 Ill.App.3d 1090, 116 Ill.Dec. 742, 519 N.E.2d 957, 959–60 (Ill. App.Ct.1988). Because the alteration Mancuso identifies suggests that the purported agreement was kept, rather than broken, her argument fails.

Mancuso next argues that even if a settlement agreement existed, she never assented to it. But Mancuso's own hearing testimony–that she was present at the

final settlement conference where the agreement was announced and its terms reviewed, but never objected–belies this argument. Mancuso also contends that if she did assent to the settlement agreement, her assent was not knowing and voluntary under the totality of the circumstances. Mancuso seems to be suggesting that due to the emotional strain of a friend's funeral (scheduled on the afternoon of the final settlement conference) and her attorney's threat to withdraw if she refused to settle, she was incapable of knowing and voluntary consent. Although emotional strain is not a listed factor in the totality analysis, *see Pierce*, 65 F.3d at 571, in some limited circumstances it could be a consideration. But such stress would have to be obvious or at least emphasized at the time the agreement would otherwise be final. We cannot accept her hindsight assertion that the emotional strain overcame her ability to understand and participate in the negotiations for the terms of the settlement. Emotional distress aside, the majority of the other factors weigh against Mancuso: she was a certified paralegal then working in a law office and had been personally involved in litigation twice before; she prepared materials on her damages from which her original settlement demands derived; and she discussed the case extensively with her attorney. Perhaps she had a bad day, but in addition to her own knowledge and involvement, she had counsel before a magistrate judge who was fully engaged in the process. His recommendation and the district court's conclusion that the agreement was knowing and voluntary were not an abuse of discretion.

 Finally, Mancuso argues that the agreement is not enforceable because the parties contemplated its reduction to writing, *see In re Marriage of Chaltin*, 153 Ill.App.3d 810, 106 Ill.Dec. 631, 506 N.E.2d 338, 340–41 (Ill.App.Ct.1987), and that the magistrate judge's acknowledgment that the parties still had "some issues ... to work out" implies that the issues were to be worked out in a written agreement. But the parties' intention to reduce the agreement to writing at some point is not enough; they must have intended that the writing be a condition precedent to the agreement's completion. *See id.*, 506 N.E.2d at 340. Absent such an intention–which Mancuso does not argue was present here–an otherwise proper oral settlement agreement is enforceable under Illinois law. *See Lampe v. O'Toole*, 292 Ill. App.3d 144, 226 Ill.Dec. 320, 685 N.E.2d 423, 424 (Ill.App.Ct.1997).[1]

Because the district court did not abuse its discretion in finding the settlement agreement enforceable, we AFFIRM the judgment of the district court.

---

1. Mancuso also argues that she "believed that the agreement included additional compensation" and that "the settlement would not be the full amount of money she would receive." Precisely what Mancuso means by this is not clear, because she asserts in her reply brief that she did not intend these statements to raise a unilateral mistake of fact argument. Moreover, Mancuso testified specifically that Austin told her before settlement discussions began that any agreement would encompass all her claims: "Joyce informed me that we would be going in for the whole settlement matter. Everything would be taken care of.... I questioned her ... about ... only go[ing] in for the damages and get that taken care of, and then the rest, punitive or anything else, would be taken care of by the judge, and she said that that wouldn't happen." Consequently, this argument seems merely to evidence Mancuso's blated dissatisfaction with the settlement, which is not grounds for finding the agreement unenforceable.